# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. KENNETH BROWN

**Appeal from the Criminal Court for Shelby County**
**Nos. 11-002623 & 11-007432      Lee V. Coffee, Judge**

---

**No. W2013-00329-CCA-R3-CD  - Filed October 9, 2014**

---

Appellant, Kenneth Brown, was convicted of one count of first degree premeditated murder, twelve counts of criminal attempt to commit first degree murder, twelve counts of aggravated assault, one count of employment of a firearm during a dangerous felony, and one count of reckless endangerment. The trial court merged the attempted murder and aggravated assault convictions. He was sentenced to life imprisonment plus 308 years. On appeal, appellant challenges the sufficiency of the evidence supporting his murder and attempted murder convictions and argues that the trial court erred by denying his motion to suppress his confession. Following our careful review of the record, the applicable law, and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLEN and CAMILLE R. MCMULLEN, JJ., joined.

Juni S. Ganguli (on appeal), and Errol Harmon and Rhonda Hooks (at trial), Memphis, Tennessee, for the appellant, Kenneth Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Theresa McCusker and Alycia Carter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case concerns a July 3, 2010 shooting on Northmeade in Memphis, Tennessee, at the house of Sonja Watkins and Felix Williams. One victim, Kimberly Jamerson, died,

and another victim, Lamarcus Moore, was shot in the leg but survived. Eleven others were named as victims of attempted murder and aggravated assault; another six people were named in one count as victims of reckless endangerment. Appellant, Devon Brown, and David Richardson were indicted in case number 11-007432 for first degree premeditated murder and in case number 11-002623 for thirteen counts of attempted first degree murder, thirteen counts of aggravated assault, reckless endangerment, and employment of a firearm during a dangerous felony. Count thirteen (attempted murder) and count twenty-six (aggravated assault) were dismissed prior to trial. Appellant was tried separately from his co-defendants, and his case proceeded to trial in October 2012.

At trial, Kimberly Jamerson's mother, Willie Brooks-Howze, testified that Ms. Jamerson was twenty-four years old when she died. Ms. Jamerson had been visiting her aunt, Sonja Watkins, when she was shot.

Robrecus Braxton, Sonja Watkins' son, testified that in July 2010 he lived at the house on Northmeade along with his mother, stepfather Felix Williams, two brothers, and two sisters. Robrecus Braxton said that there were several people at his house on July 3, 2010, preparing for the Fourth of July holiday. He specifically named Bianca Nevels, Lashanna Jones, Deangelo Smith, Kenneth Baker, Rodney Davenport, Mark Chambers, Steven Chambers, Felix Williams, Christopher Braxton, and Nakia Greer. On the evening of July 3, he was standing on the sidewalk outside of his house talking with Felix Williams and Nakia Greer when a green Chevrolet Lumina stopped nearby. Two men exited the car and approached them. One of the men told Mr. Greer, "'You owe me.'" Robrecus Braxton testified that he was confused about what was happening, and the man told him that someone had taken "weed" from him. Felix Williams told the man that he would look into the situation. The two men returned to the Lumina and drove away. They returned to Northmeade with a third person ten to fifteen minutes later. The three men approached again, and one of them began "talking reckless[ly]," demanding payment. Robrecus Braxton testified that Felix Williams gave the man $5. Robrecus Braxton identified appellant in the courtroom as the man to whom Felix Williams gave the money.

Robrecus Braxton testified that the three men returned to the Lumina. He said that the Lumina almost "clipped" him as it was driving away. He explained that the Lumina would have hit him if he had not reacted to get away. In response, he threw a beer can into the open passenger window of the Lumina. The Lumina stopped, and the three men returned. Robrecus Braxton testified that he, Christopher Braxton, and Kenneth Baker fought with the three men from the Lumina. He said that none of the six participants in the fight had weapons and that it was a "fist fight." When the fight broke up (Robrecus Braxton did not explain how the fight was broken up), the three men returned to the Lumina. As they left,

they said, "'All right, that's what up.'" Robrecus Braxton said that he understood the men to mean, "We'll be back," but he admitted that they did not actually use that phrase.

Robrecus Braxton further testified that after the men left in the green Lumina, he and his friends and family continued to "hang[] out." He said that he was under the carport when he thought he saw and heard fireworks. He then heard what he believed to be gunshots. He ran to the backyard because he "was scared." Robrecus Braxton said that he heard one of his friends yell, "'Kim's been shot.'" He explained that "Kim" was his cousin, Kimberly Jamerson. Robrecus Braxton said that he continued to hear gunshots and that he saw Mark Chambers shooting back. Robrecus Braxton believed that Mark Chambers' action in firing back "made them stop shooting."

Robrecus Braxton said that once the gunfire ended, he went to the front of the house. He saw Lamarcus Moore being carried to a car, and he saw Kimberly Jamerson lying on the sidewalk. Robrecus Braxton heard someone say that Ms. Jamerson had been shot in the head. He said that he left the house in a car and drove until he saw "undercover police." He told the police officers that his cousin had been shot, and the police went to his house. Robrecus Braxton estimated that he heard at least sixty shots and said that the gunfire hit houses and cars in the area. He believed that the gunfire occurred two to three hours after the fist fight. Robrecus Braxton testified that he identified appellant in a photographic lineup the following day.

On cross-examination, Robrecus Braxton testified that the can he threw into appellant's passenger window was full. He said that ten or eleven other people were in the yard during the fist fight. He recalled seeing the green Lumina once after the fight, driving on a nearby road. Robrecus Braxton said that he knew the men in the Lumina lived in the neighborhood but did not know their addresses. Robrecus Braxton agreed that he saw Mark Chambers shooting and stated that Mark Chambers was known to carry two guns. He did not recall seeing Steven Chambers with a gun.

Felix Williams testified that on July 3, 2010, while his family was making preparations for a Fourth of July celebration, his sister-in-law, Dena Watkins, tried to purchase a $5 bag of marijuana. Nakia Greer flagged down appellant, who was driving by in a Lumina, to inquire about purchasing marijuana. Appellant drove away and then returned. When appellant returned, he and Dena Watkins stepped away for a few minutes. Then, appellant drove away, and Ms. Watkins left separately to go to a store. Fifteen to twenty minutes later, appellant returned and confronted Mr. Greer with an accusation that Ms. Watkins had taken some of appellant's marijuana without paying for it. Mr. Williams testified that appellant said his "half-ounce [was] a gram short" and that he wanted Mr. Greer to pay for the missing marijuana. Mr. Williams told appellant to come back later. Mr.

Williams testified that he intended to find out what happened to the marijuana when Ms. Watkins returned. According to Mr. Williams, Ms. Watkins denied having taken the marijuana. Mr. Williams said that when appellant returned, he gave appellant $5 and asked him to leave. Appellant and his two co-defendants returned to the their car and began driving away. However, in the process of driving away, appellant "almost pinned Robrecus Braxton in between" appellant's car and the car beside which Mr. Braxton was standing. Mr. Williams recalled seeing Mr. Braxton throw a beer into appellant's car. Appellant stopped his vehicle, and he and the two men with him approached Mr. Braxton. They began fighting, and Mr. Williams and Mr. Greer tried to break up the fight. Eventually, the men stopped fighting, and appellant and his co-defendants left. Mr. Williams testified that one of the men said, "'We'll be back.'" Mr. Williams also recalled "hearing a window bust." Mr. Williams said that he saw appellant's car again later but did not "think anything of it because [they] all stay in the same neighborhood."

Mr. Williams testified that some time later, he was walking his niece, Kimberly Jamerson, to her car when someone shot bottle rockets at him. He said that one bottle rocket "flew in front of" him and one hit him in the arm. Mr. Williams stated that the gunshots began approximately thirty seconds later. He went to the backyard and then into his house. He saw a blood trail inside and learned that Lamarcus Moore had been shot. He testified that he was scared during the gunfire. Mr. Williams said that he called 9-1-1 from a neighbor's house. The following day, he identified appellant in a photographic lineup, noting on the lineup form, "Killed my niece. He is the driver."

On cross-examination, Mr. Williams said he did not know from what direction the gunshots came. He said that he heard assault rifles, a handgun, and a shotgun. He testified that he did not see who shot Kimberly Jamerson.

Kenneth Baker testified that he was at the house on Northmeade on July 3, 2010, and participated in the fist fight. He recalled seeing appellant and appellant's brother, Devon Brown, outside during what he believed was the attempted sale of marijuana to Dena Watkins. He saw appellant and Devon Brown again later, with a third man. Mr. Baker said that the men accused his aunt of stealing some of their marijuana. Mr. Baker heard Felix Williams offer to "pay them some money to leave, to keep the commotion down." He said that one of his cousins heard one of the individuals with appellant say, "'These p***y a** n****** don't want it.'" Mr. Baker said that he and his cousins then began fighting the three men, "three on three." He further said that Felix Williams tried to break up the fight. Mr. Baker testified that the fight ended "[w]ith them saying they'll be back. And they came back over for the shooting." Mr. Baker said that later that night, he was in the front yard when he saw "infrared lights on [his] shirt, green and red lights on [his] shirt." He described the lights as being "[l]ike what's on a gun, what you aim it with, to hit your target with." He did not

think anything of the lights until he heard gunshots. Mr. Baker said that he heard fireworks first and then gunshots. He ran under the carport when the gunfire began. He testified that he was "scared [and] [i]n fear for [his] life." After the gunfire ended, he found Kimberly Jamerson lying on the concrete.

On cross-examination, Mr. Baker testified that there were approximately thirty people at the Northmeade house on July 3. He agreed that some of the people were drinking alcohol and some, including himself, were smoking marijuana. Mr. Baker said that the comment, "'These p***y a** n****** don't want it,'" was said by appellant as he was leaving in his car before the fight and that after the comment was made, Robrecus Braxton threw a beer can into appellant's car. Mr. Baker testified that the driver stopped the vehicle and was the first to exit the car but that he could not recall whether appellant was the driver. He agreed that there were many people in the yard during the fight but could only recall two others besides himself actually fighting. He further agreed that his group "got the best of" appellant's group during the fight. When shown a picture of appellant taken by the police on July 6, 2010, Mr. Baker identified appellant as "[t]he enemy," pointed him out in the courtroom, and agreed that the picture represented appellant's appearance after the fight. He testified that he knew the back window of appellant's car was broken after the fight but that he did not know how it was broken. Mr. Baker said that he saw the lights on his shirt fifteen to thirty minutes after the fight. He agreed that he made the assumption that appellant fired on his family because of the fight. Mr. Baker also identified photographs of Steven Chambers and Mark Chambers. He explained that the police showed him their photographs when he was giving his statement. During the police interview, he wrote on the bottom of the photograph of Steven Chambers "fired back" and on the bottom of Mark Chambers' photograph, "returned fire back." Mr. Baker testified that the Chambers were the only people at the Northmeade house whom he saw with guns.

Mark Chambers testified that he visited the Northmeade house on July 3, 2010. His nephew, Lamarcus Moore, accompanied him, and his brother, Steven Chambers, arrived later. He said that after dark, he was eating under the carport when he heard fireworks and saw people running. At first, he believed that they were "playing," but someone told him that Mr. Moore had been shot. He ran to the front yard to look for Mr. Moore, but when he realized bullets were hitting the house and vehicles parked outside, he "ran back behind the wall." He returned to the front yard to again look for Mr. Moore, but this time, he began firing both of his guns — a .9mm Smith and Wesson and a .9mm Ruger — in the direction from which the gunfire came. Mark Chambers testified that the gunfire was coming from a hill several houses down the street from the Northmeade house and that he could see light flashing from the gunfire. He heard more than fifty gunshots and said that the gunfire lasted six or seven minutes. He said that he fired seven to ten times from each of his guns and that he then ran all around the Northmeade house. He found Mr. Moore inside the house and

took him to a hospital. Mark Chambers said that he knew his brother had one of his guns at some point but that both guns "ended up" in Mark Chambers' car, a maroon Buick Roadmaster. Both of his guns were entered as exhibits to the trial.

During cross-examination, when asked whether a truck next door was in his line of sight while he was shooting, Mark Chambers agreed that he saw a truck next door but never confirmed that it was in his line of sight while shooting.

Steven Chambers testified that he arrived at the Northmeade house during the afternoon of July 3, 2010. He recalled that after dark, he was standing around with several other guests behind a truck parked in the driveway when he heard what he thought were firecrackers. He realized that he was hearing gunshots when he saw bullets striking the truck. He and the other guests ran to the backyard. When he was in the backyard, he heard that Kimberly Jamerson had been shot. Steven Chambers testified that he had seen her walking to her vehicle before the gunfire began. Steven Chambers said that while the gunfire continued, he went into the Northmeade house and found his nephew, Lamarcus Moore, lying in the floor and learned that Mr. Moore had been shot. When his brother, Mark Chambers, entered the house, Mark Chambers and "Cleotha" began helping Mr. Moore to Mark Chambers' car. Steven Chambers testified that Mark Chambers dropped one of his guns, so he picked it up and fired a couple of shots to cover Mark Chambers, Cleotha, and Mr. Moore as they moved across the yard. Once they all got in Mark Chambers' car, Steven Chambers drove them to the Regional Medical Center because Mark Chambers did not know the way. He returned his brother's gun to him while they were in the car. Steven Chambers estimated that he heard approximately fifty rounds being fired that evening and agreed that he had been afraid for his life.

Memphis Police Sergeant Kevin Lundy testified that he participated in the investigation of the shooting at the Northmeade house. He was responsible for collecting two guns from a maroon Buick Roadmaster and transporting the guns to the police department's property room.

On cross-examination, Sergeant Lundy agreed that Mark Chambers had been originally charged with Kimberly Jamerson's murder but was later cleared. He testified that Mark Chambers gave him a statement in which he said that he "was looking at a truck at the house next-door and their car down the street on the hill towards Rangeline" when he fired his weapon.

Memphis Police Sergeant Marlon Wright testified that he was a crime scene investigator at the time of the incident in question and responded to the crime scene the night of July 3, 2010. He said that the police discovered sixty-one shell casings fired from a high-

powered rifle in the yard of a house on the corner of Helmwood and Northmeade (hereinafter "Helmwood"), which was over 233 feet from the crime scene. He explained that the Helmwood location was on a steep hill overlooking Northmeade, and he testified that from Helmwood, a person could see all of Northmeade. Conversely, a person at the Northmeade crime scene would not have been able to see anyone at the Helmwood location due to the angle of incline and the trees in the yard at Helmwood. Sergeant Wright further testified that the police found "fifteen or so" casings at the Northmeade crime scene. The Northmeade house, mailbox, and vehicles parked outside had all been struck by bullets.

On cross-examination, Sergeant Wright agreed that a truck parked at the Northmeade crime scene obstructed the view of the Helmwood location from the crime scene.

Inga Yancey testified that she lived at the house at the Helmwood location. She was at home but asleep the night of July 3, 2010. Ms. Yancey testified that she was awakened shortly after midnight by what she believed were firecrackers. She checked on her dog in the backyard and returned to sleep. Ms. Yancey said that she did not see anything in her yard that night. She testified that when she did yard work earlier that week, she did not see shell casings in her yard.

Dena Watkins testified that she visited her sister's family at the house on Northmeade July 3, 2010, to prepare for the Fourth of July. She arrived at 10:30 a.m., and the other people at the house at that time were Sonja Watkins, Felix Williams, Christopher Braxton, Robrecus Braxton, Angel Henderson, Veronique Watkins, and Lantrivia Watkins. Later that day, after dark, she asked Felix Williams' friend, who went by the nickname "Face," whether he knew anyone who could sell her marijuana. "Face" flagged down a green Lumina and asked the driver for marijuana. Dena Watkins testified that there were two men in the Lumina. The two men returned with marijuana for her, but she decided not to accept it after she inspected the bag. She said that she held up the bag to look at the marijuana, that she never opened the bag, and that another person told her that he could find better marijuana for her. She said that she returned the bag to the men from the Lumina and left in search of better marijuana. Dena Watkins testified that when she returned, she learned that the men from the Lumina had accused her of stealing a gram of marijuana. She said that she had not but offered to give them $5 anyway. She waited for the men to return but left after having waited thirty minutes. When she returned, Felix Williams told her that the men had come back and that he had given them $5. Dena Watkins said that some time after that, she saw the Lumina return. She testified that the Lumina drove very close to some men standing on the street, "almost like they [ran] over their feet." The Lumina stopped, and three men exited the car and began fighting the Northmeade group. Felix Williams broke up the fight, and the men from the Lumina left. Dena Watkins said that she could not identify any of the men from the Lumina because it was dark. She testified that she was not at the Northmeade house

when the shooting occurred but arrived immediately after learning that Kimberly Jamerson had been shot.

On cross-examination, Dena Watkins identified several cars that were on the street and in the driveway at the Northmeade house. In particular, she identified Jalon Baker's car, Sonja Watkins' car, a vehicle on which Felix Williams was working, and Travis Britton's truck. She recalled that Travis Britton was at the Northmeade house before the fight occurred.

Sonja Watkins testified that she was inside her house when the fight began but went outside to yell for the fight to stop. She said that she recognized appellant from the neighborhood and identified him in the courtroom. She said that when appellant and his friends left, one of them said, "'Don't worry about it. We'll be back.'" Later that evening, she heard what she thought were fireworks, but she soon realized that the noise did not sound like fireworks. She went through the house and checked on the six children in a bedroom. She said that she put the children under a table and went back to the hallway. She recalled that the children were scared and screaming. She saw one of the young men in the hallway, and he asked whether he had been shot. Sonja Watkins testified that blood was pouring from his pants leg. She further testified that it "sounded like a war zone" outside. One of her nieces told her that another niece had been shot. Sonja Watkins went to where Ms. Jamerson was lying on the sidewalk. Ms. Jamerson was still alive at that point. Sonja Watkins said that she felt helpless and afraid during the incident. She testified that the following people were at her home that night: Robrecus Braxton, Christopher Braxton, Felix Williams, Chymia Baker, Jalon Baker, Lashanna Jones, Bianca Nevels, Rodney Davenport, Nakia Greer, Cleotha Norwood, Mark Chambers, Steven Chambers, Portia Williams, Terriance Webb, and several children.

On cross-examination, Sonja Watkins testified that Felix Williams drove a green Cadillac. She said that she saw Robrecus Braxton, Christopher Braxton, and Kenneth Baker fighting appellant. She said that eleven to fifteen other people were in the yard. Sonja Watkins estimated that the gunfire happened six hours after the fight. She agreed that people were drinking alcohol that evening, but she said that she had no knowledge of anyone smoking marijuana. She further agreed that she did not know exactly who was outside during the shooting. She said that she did not see anyone with guns at her house but that she heard gunfire close to the house at one point.

Lamarcus Moore testified that he went to the party at the Northmeade house with his uncles, Steven Chambers and Mark Chambers. He heard about the fight but was not there when it happened. He testified that when the shooting began, he first saw firecrackers or bottle rockets then began hearing gunfire. He said that he was shot and began to run. Mr.

Moore said that he was hit in the main artery in his left leg. He recalled Cleotha Norwood and his uncles taking them to Mark Chambers' car and then to the Regional Medical Center. He testified that he had two surgeries but that the doctors were not able to remove the bullet. On cross-examination, Mr. Moore said that his uncles fired back in retaliation.

Dr. James Lewis Caruso testified that he performed Kimberly Jamerson's autopsy. She had two gunshot wounds to her head, one an entrance wound and the other an exit wound. There was no stippling around the wounds, indicating that she was not shot at close range. The bullet entered the right side of her head and traveled almost straight back. Despite the fact that the bullet exited Ms. Jamerson's head, it left projectile fragments behind, which Dr. Caruso collected during the autopsy. He explained that he could not recover all of the fragments but collected the larger pieces. Two pieces were from the bullet's copper jacket, and two were from the bullet's core. Dr. Caruso sealed the pieces and gave them to law enforcement agents. Dr. Caruso testified that the bullet was a "reasonably high velocity projectile" and caused so much damage to Ms. Jamerson's brain that it was "pulpified," which he explained meant "complete interruption of the integrity of the tissue along the wound path." He said that "her chances of surviving an injury like that [were] vanishingly small to none."

Memphis Police Officer Demar Wells testified that he was one of the crime scene investigators assigned to this incident. He said that he collected a total of sixty-eight casings at the Helmwood location. Of the sixty-eight, there were thirty-two .30 carbine casings, eight .45 caliber casings, twenty-five LC05 casings, and three .20 gauge casings. At the Northmeade location, he found five 7.62x.39 casings and nine .9mm casings. In addition, he found two bullet fragments at the Northmeade location. The Northmeade house, vehicles in the immediate area, and a mailbox in the immediate area sustained damage from bullets, which Officer Wells documented in photographs. He also placed a flag through the holes in the mailbox to estimate the trajectory of the bullet that hit the mailbox. Officer Wells opined that the bullet that struck the mailbox came from west of the box and traveled east, toward the Helmwood location. On cross-examination, Officer Wells agreed that the 7.62x.39 casings were from a high-powered rifle.

Memphis Police Officer Jeffrey Garey testified that he recovered two .9mm handguns from a Buick Roadmaster. One was a Smith and Wesson, which was found under the front passenger seat, and the other was a Ruger found in the trunk of the vehicle. Officer Garey also processed casings recovered from the Helmwood location for fingerprints but was unsuccessful.

Memphis Police Sergeant William Merritt testified that he was the case coordinator in charge of the investigation into the incident at Northmeade. He said that the investigation

led to the arrest of appellant on July 4, 2010. Sergeant Merritt interviewed appellant on July 4 and July 6. In appellant's July 4 interview, he admitted his involvement in the fist fight but denied participating in the shooting. On July 6, however, appellant gave a written statement in which he confessed his part in the shooting.

Appellant's statement to Sergeant Merritt was read aloud to the jury. In the statement, appellant explained his version of the fist fight. He said that after the bag of marijuana came up a gram short of the original amount, he returned to the Northmeade address with David Richardson. When the woman to whom he had tried to sell the marijuana was not at the house, he told the people there, "I ain't going to disrespect your house. I just want to get this stuff straight 'cause she did me wrong." He drove away and returned several minutes later. A man gave him $5, and appellant told him that he appreciated him and apologized for the way he approached them. Appellant told Sergeant Merritt that he began to drive away but that because another vehicle was on the street, he had to drive away slowly. He said that the people at Northmeade began "talking violent" and that one of them threw a beer can into his car, hitting him. He and David Richardson got out of the car and began fighting. He said, "They was standing out there at least eight deep, so they had jumped on me and Lil Dave." They made it back to his car, but as he was driving away, someone broke his car window. He returned home, and his family was angry about what happened.

Appellant then told Sergeant Merritt about the shooting:

> Without warning or no say or nothing, guns started coming out 'cause we saw them riding around the house in a green Cadillac. Lil Dave was talking about going back around there. I really wasn't too agreeable with him, but since my brother was going, I had to go with him. I felt like that since they had given me my $5 that everything was okay.

> I decided to drive, so I drove and parked on Helmwood. Then we jumped out. All three of us [David Richardson, Devon Brown, and appellant] then went down there. I went down there with no intent to shoot anybody. I shot straight but upward, and I didn't pay no attention to nobody else, and when I got through shooting mine, I ran back to the car.

> My brother hopped in second, and Dave hopped in last. He stayed back so long that we thought he had got shot or something, but he was still back there shooting. Then we pulled off, I ditched my gun, and I guess Lil Dave ditched his, and we left.

-10-

Sergeant Merritt asked appellant why they fired shots at the Northmeade group, and he responded that "we were really just in fear. They just didn't want to fight, and they had no reason to be circling the block around my house." Appellant told Sergeant Merritt that he had a Glock .45 and fired six to eight shots. His brother had a shotgun and fired two shots. He did not know what kind of gun David Richardson had. Sergeant Merritt testified that the police never found appellant's gun or David Richardson's gun. Appellant's Chevy Lumina was impounded.

On cross-examination, Sergeant Merritt agreed that a photograph of the Northmeade location showed a green Cadillac parked near the house. He further agreed that a photograph of a blood stain on the sidewalk in front of the Northmeade house was most likely where Kimberly Jamerson fell. The blood stain was by a truck. Sergeant Merritt testified that the casings found at Northmeade were in the front yard but that he did not "know if they were leading towards the body or not." Sergeant Merritt said that he had gunshot residue kits collected from four to five people, including the two Chambers brothers and possibly Felix Williams. He said that while he was not a ballistics expert, he knew that a .9mm handgun would not fire 7.62x.39 bullets. Sergeant Merritt testified that he saw injuries on appellant on July 4 but did not take pictures of the injuries until July 6. He said that appellant never asked for medical attention.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Steve Scott testified as an expert in firearms identification. He analyzed evidence associated with the shooting at Northmeade, including evidence that was recovered from Kimberly Jamerson's autopsy and that was found at Helmwood. From Northmeade, he was given two .9mm firearms, nine .9mm cartridge casings, six 7.62x.39 cartridge cases, and bullet fragments. He testified that six of the .9mm cartridge cases were fired from the Smith and Wesson .9mm handgun and that three of the .9mm cartridge cases were fired from the Ruger .9mm handgun. The 7.62x.39 cartridges were all fired from the same firearm. Special Agent Scott testified that some of the bullet fragments were from a .30 caliber class bullet and some were .22 caliber that came from "something like a .223 Remington caliber firearm, such as an AR-15, or a military type style rifle." He could not determine whether the .22 caliber bullets were fired from the same weapon, but he said that the .30 caliber bullets were fired from the same weapon.

Special Agent Scott opined that while the 7.62x.39 cartridges are a .30 caliber class bullet, the .30 caliber class bullet fragment was not consistent with the 7.62x.39 casing. He said that it would be very rare to see a 7.62x.39 cartridge loaded with the type of .30 caliber bullet found at Northmeade. He stated that the .30 caliber bullet fragment was "much more common to something like a .30 carbine, which is the name of a cartridge that's typically fired . . . in a military M1 rifle." Special Agent Scott also examined the bullet fragments

recovered during Kimberly Jamerson's autopsy. He determined that the autopsy bullet fragments matched the .30 carbine caliber bullet fragments found at Northmeade and that the autopsy fragments and the Northmeade fragments were fired from the same firearm.

From the Helmwood location, Special Agent Scott analyzed thirty-two .30 carbine cartridge cases, eight .45 auto cartridge cases, twenty-five .223 Remington caliber cartridge cases, and three .20 gauge shot shell cases. He opined that the .30 carbine cartridge cases were all fired from the same firearm and that they were typically loaded with the type of bullet recovered from Kimberly Jamerson's autopsy. He further opined that the .45 auto cartridge cases were fired from the same weapon. Special Agent Scott said that the .223 Remington caliber cartridge cases were consistent with being fired from the same firearm and consistent with the .22 bullet fragment from Northmeade. He stated that the .20 gauge shot shells had been loaded with rifle slugs and had been fired from the same weapon. Special Agent Scott testified that laser sights on weapons came in both green and red and that of the weapons used at the Helmwood location, the weapons firing the .30 carbine cartridges and the .223 Remington caliber cartridges were the most likely to have laser sights.

Special Agent Scott opined that based on the location of the .30 carbine cartridges, it was likely that the shooter had been moving, but he conditioned his opinion by saying that the cartridges would have to have been ejected consistently and not have bounced when they landed. He further opined that if four weapons were used by three people, then it was likely that the person with the pistol also had one of the other guns because it would have been difficult for one person to use two of the long guns. Special Agent Scott confirmed that the casings ejected at Helmwood could not have landed at Northmeade.

On cross-examination, Special Agent Scott agreed that common firearms that fire .30 caliber bullets included the 30-06 Springfield, 30-30 Winchester, .308 Winchester/ 7.62x.51mm Nato. He said that he generated that list based on the FBI's rifling profile database. He agreed that other firearms could fire .30 caliber bullets, but he did not believe an AK-47 or SKS could be modified to fire .30 caliber bullets.

The State rested its case, and appellant moved for a judgment of acquittal. After his motion was denied, appellant called one witness on his behalf. Memphis Police Officer Hope Smith testified that she processed a blue-green Chevy Lumina in connection with this case. The Lumina had a broken rear windshield. On cross-examination, Officer Smith testified that she found paperwork with appellant's name in the Lumina's glovebox.

Following deliberations, the jury convicted appellant of one count of first degree premeditated murder, twelve counts of attempted first degree murder, twelve counts of aggravated assault, one count of employment of a firearm during a dangerous felony, and one

count of reckless endangerment. The trial court merged the attempted murder and aggravated assault convictions. Appellant received an effective sentence of life plus 308 years.

## II. Analysis

### A. Sufficiency of the Evidence

Appellant contends that the evidence was not sufficient to support his convictions for first degree murder and criminal attempt to commit first degree murder. In his brief, he states, "Appellant does not contest firing his weapon but maintains that he had no intent to kill." He also claims that he fired in self-defense and suggests that one of the Chambers brothers might have been responsible for killing Ms. Jamerson.[1]

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the

---

[1] The State argues that appellant's appeal of his convictions from case number 11-002623 should be dismissed for failure to file a notice of appeal. The two cases were consolidated for trial, and nothing in the record indicates that the cases were *not* consolidated for appeal. The record shows that only case number 11-007432 was listed on the notice of appeal, but the body of the notice refers to the trial court's denial of a motion for new trial in which the trial court was ruling on the consolidated case. "The purpose of the notice of appeal is simply to declare in a formal way an intention to appeal. As long as this purpose is met, it is irrelevant that the paper filed is deficient in some other respect." Tenn. R. App. P. 3, Advisory Comm'n Cmts. There is no question in this case that appellant intended to appeal the entirety of his case, both case number 11-007432 and number 11-002623. Therefore, we will not dismiss the appeal on this basis.

weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted appellant of premeditated murder and attempted premeditated murder. Tennessee Code Annotated section 39-13-202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness

-14-

immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

The State pursued a theory of criminal responsibility in this case. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and furthermore, the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Viewed in the light most favorable to the State, the evidence at trial showed that appellant and two others fired weapons at a large gathering of people on Northmeade, killing one and wounding one. Appellant was on the losing end of a fist fight after he accused Dena Watkins of stealing $5 worth of marijuana from him. His car was damaged in the aftermath of the fight. Later, appellant, David Richardson, and Devon Brown gathered firearms, and appellant drove them to the Helmwood location. The forensics revealed that four weapons were fired from that location, and the police collected thirty-two .30 carbine cartridge cases, eight .45 auto cartridge cases, twenty-five .223 Remington caliber cartridge cases, and three .20 gauge shot shell cases. The men disposed of the weapons after the shooting, and the weapons were never found. TBI Special Agent Scott testified that the bullet that killed Kimberly Jamerson was consistent with a .30 carbine.

Appellant confessed his involvement in the shooting but claims on appeal that he "had no intent to kill." However, it is clear that either appellant or one of the men with him fired the shots that killed Ms. Jamerson and wounded Mr. Moore. Because it is unknown which of the men fired the murder weapon, it is appropriate to apply a criminal responsibility theory to determine appellant's guilt. *See State v. Dickson*, 413 S.W.3d 735, 744-48 (Tenn. 2013) (concluding that evidence of the shooter's premeditation was sufficient to support defendant's conviction for attempted premeditated murder when defendant solicited the aid of the shooter

-15-

and when the shooting was a natural and probable consequence of the defendant's actions). In this case, the State sufficiently showed that appellant shared the intent required for premeditated murder with his accomplices and that he actively promoted the commission of the crime. Appellant and his accomplices procured weapons before the crime, set up at a location where the victims would be unable to see them, and used deadly weapons on unsuspecting, unarmed victims. The killing of Ms. Jamerson and the wounding of Mr. Moore were the natural and probable consequences of firing upon a crowd of people. Thus, appellant was criminally responsible for Ms. Jamerson's murder and the attempted murders of Mr. Moore and the other named victims. We conclude that this evidence was sufficient for any rational jury to find appellant guilty beyond a reasonable doubt of first degree premeditated murder and attempted premeditated murder.

## B. Motion to Suppress

Appellant argues that the trial court erred by denying his motion to suppress his July 6 confession to police. As grounds for suppression, he contends that he was arrested without probable cause when the only connection between him and the offenses was the uncorroborated statement of an accomplice. He further argues that his being placed on a forty-eight-hour hold was proof that the police did not have probable cause to arrest him until after his admission.[2]

### 1. Suppression Hearing

Memphis Police Sergeant William Merritt testified that he had worked for the police department for twenty-seven years and twelve years with the homicide bureau. He was the case coordinator for the incident in question. He said that the police learned from witnesses to the shooting that the shooting stemmed from a July 3 dispute over a marijuana purchase. The witnesses identified appellant as being involved in that dispute. On July 4, Robrecus Braxton identified appellant in a photographic array as one of the individuals with whom he had fought on July 3. Mr. Braxton told police that appellant left the scene of the fight in a green Chevrolet Lumina. Police "learned that a greenish-colored Chevy Lumina was at the scene of the shooting maybe thirty to forty-five minutes after the fight occurred."

---

[2] The State contends that appellant waived this argument for failure to timely file a motion for new trial. After carefully reviewing the record, we cannot agree with the State. The judgments in question were not file-stamped; therefore, "there is nothing in the record to conclusively state what day the judgment was filed with the trial court clerk." *State v. Martin Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at *9 (Tenn. Crim. App. Aug. 6, 2013). Without this information, we cannot rule that appellant's motion for new trial was untimely.

The police matched the Lumina to a car owned by appellant's mother. The Lumina was found at the home of a relative of David Richardson. Because David Richardson had also been identified as being involved in the earlier fight, the police questioned him on the afternoon of July 4 at the criminal justice center. Richardson "implicated himself as being one of the shooters that fired shots at the Northmeade address, and he implicated [appellant] as one of the individuals that participated in the shooting with him." Appellant was brought to the criminal justice center at 7:45 p.m. on July 4. Sergeant Merritt began interviewing him at 8:30 p.m.

Sergeant Merritt testified that appellant had visible bruises at the time but never requested medical attention. Appellant did not appear to be under the influence of marijuana, and Sergeant Merritt did not smell marijuana on appellant. Appellant told Sergeant Merritt that he could read and write and that he had completed the tenth grade. Sergeant Merritt had appellant read a portion of the advice of rights form to verify appellant's reading ability, and appellant "was able to read the form . . . without any problem." Subsequently, Sergeant Merritt read the whole form to appellant, and appellant indicated that he understood his rights and agreed to speak with the police.

In his first interview, appellant admitted his involvement with the fight but denied involvement in the shooting. Appellant said that he went to the Northmeade house alone. He also said that his mother could provide him an alibi for the evening. Sergeant Merritt called appellant's mother, and she told the police that she had not seen appellant at all on July 4. Appellant also told Sergeant Merritt that he did not know David Richardson and continued denying that he knew Richardson even after Sergeant Merritt told him that the police found appellant's mother's telephone number saved in Richardson's telephone. Sergeant Merritt testified that he stopped the interview and took appellant into custody at that point.

Sergeant Merritt testified that he believed the police had probable cause to arrest appellant after the first interview. He stated the following factors for the basis for probable cause:

> The fact that we had at least two witnesses who identified [appellant] as being involved in the fight before the shooting. They identified him in a photospread. The fact that [appellant] left the scene of that fight in a green-colored Chevrolet Lumina. Witnesses described seeing a vehicle that fit that description at the top of the hill where the gunfire started. We were able to learn that [appellant's] mother was the owner of a green Chevy Lumina. We located that vehicle at the Co-Defendant's family member's home. . . .

-17-

We had the statement of . . . the Co-Defendant that implicated [appellant] as being involved in the incident. And the fact that [appellant] denied knowing the Co-Defendant, the fact that we were able to discredit his alibi with his mother, we told him about that, and the fact that . . . [appellant's] mother's telephone [number] was found in the Co-Defendant's phone.

Sergeant Merritt testified that Sergeants Brown and Moses interviewed appellant on July 5. He interviewed appellant himself again on July 6. Sergeant Merritt explained that Devon Brown, appellant's brother, had given a statement implicating himself, appellant, and Richardson. Sergeant Merritt wanted to confront appellant with his brother's statement "to see if we could get [appellant] to give us a statement about the case." He contrived for appellant to see his brother in the homicide bureau office and had Devon Brown admit that he had given an inculpatory statement to the police. Thereafter, appellant admitted his involvement in the shooting. Appellant's statement was typewritten, and appellant reviewed the written statement and made some edits to it after reading it.

Sergeant Merritt said that appellant's injuries, which he had first noticed on July 4, had worsened by July 6. He photographed the injuries. Sergeant Merritt testified that arrestees receive medical attention if needed during the booking process. He testified that booking officers "would not take him into the jail" if they noticed anything out of the ordinary.

Regarding the forty-eight-hour hold placed on appellant, Sergeant Merritt testified that its purpose was to allow the District Attorney General's office time to review the case "so we could get some direction on what charges were going to be placed." He agreed that he had "gotten all the information that [he] needed . . . to place [appellant] under arrest prior to that hold."

On cross-examination, Sergeant Merritt testified that appellant was in custody during his first interview and that he was not free to leave at that point. He said that the forty-eight-hour hold was placed on appellant because he was in custody and not because he wanted more time to investigate. Sergeant Merritt agreed that the affidavit of complaint and arrest warrant were filed on July 6 at 3:23 p.m. Appellant had given his admission earlier that morning.

Melynda Harriss testified that she transcribed appellant's July 6 statement. She said that she would not take the statement of any witness or suspect who appeared to be under the influence. Ms. Harriss said that she did not notice anything unusual about appellant, that his physical condition was "fine," and that he did not appear to be under the influence of marijuana or any other narcotic.

Memphis Police Sergeant Michael Brown testified that he interviewed appellant on July 5. Appellant was advised of his *Miranda* rights and agreed to waive those rights. At that time, appellant was adamant that he was not present when the shooting occurred. When asked to give a written statement about his version of the events, appellant stated that he did not want any information written down. He told Sergeant Brown that he did not want to say where he was when the shooting occurred, so Sergeant Brown stopped the interview. Sergeant Brown testified that appellant did not request medical attention and did not appear to be under the influence of marijuana.

Memphis Police Sergeant Kevin Lundy testified that he interviewed witnesses to the shooting on July 4. Nakia Greer and Felix Williams both identified appellant in a photographic array. Felix Williams wrote on the form, "He killed my niece. He is the driver."

On cross-examination, Sergeant Lundy agreed that none of the witnesses actually saw the shooters. Sergeant Lundy agreed that he obtained a forty-eight-hour hold from a judicial commissioner and agreed that defense counsel properly summarized the procedure for obtaining a hold as follows:

> [Y]ou draft an affidavit, go see one of the commissioners, explain to the commissioner what you feel the probable cause is, the commissioner then . . . swears you or by your attestation on the form, makes a determination and issues that hold.

The forty-eight-hour hold order was entered as an exhibit to the hearing. As stated on the order, the reason for requesting the hold order was the following:

> On July 3, 2010, Kimberly Jamerson was shot to death at . . . Northmeade. Multiple rounds of gunfire were discharged at the time Ms. Jamerson was shot to death. The [appellant] was implicated by an accomplice as being present and firing shots in the direction of Kimberly Jamerson at the time Ms. Jamerson was shot and killed. Additional time is needed [f]or the case to be reviewed by the AG's office.

The hold order further stated that the judicial commission reviewed the facts and determined that there was probable cause to believe that appellant committed first degree murder. Sergeant Lundy agreed that he obtained a search warrant related to this case on July 5. He further agreed that the investigation was still ongoing after appellant's arrest.

Following the presentation of proof and arguments of counsel, the trial court denied appellant's motion to suppress. The trial court ruled that the police had probable cause to

arrest appellant on the evening of July 4. In support of its ruling, the trial court stated that the police had statements from witnesses about appellant's involvement in the fight and David Richardson's statement inculpating appellant in the shooting. The police also connected appellant's car to both the fight and the shooting and connected appellant to Richardson through Richardson's telephone and appellant's car, which was found at the residence of a relative of Richardson. The trial court stated that the information available to the police provided a basis for probable cause independent of Richardson's statement but that Richardson's statement was also sufficiently corroborated. The trial court also accredited the police officers' testimonies that the forty-eight-hour hold was not sought to give the police more time to develop probable cause. Finally, the trial court ruled that appellant's admission was voluntarily given, accrediting the testimony that appellant did not appear to be under the influence of marijuana or to be in need of medical attention.

## 2. Standard of Review

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

## 3. Probable Cause to Arrest

Appellant contends that the trial court should have suppressed his July 6 statement to the police because the police did not have probable cause to arrest him on July 4. He claims that the police had only the uncorroborated statement of another suspect to connect appellant to the shooting, which was insufficient to support a finding of probable cause to arrest appellant.

We begin with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our supreme court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). "'While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not.'" *Id.* (quoting *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006)).

An arrest supported by probable cause is an exception to the warrant requirement. *Id.* (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)); *see Brown v. Illinois*, 422 U.S. 590, 598 (1975). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 SW.3d at 277-78 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, 382 S.W.3d at 278 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005)). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id.* (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted).

"If the arresting officers rely in part on information from an informant from the criminal milieu, they must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable." *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000); *see also State v. Bishop*, 431 S.W.3d 22, 38 (Tenn. 2014). The same test is applied when "determining whether the self-inculpatory statement of one suspect may give police probable cause to arrest a person the suspect identifies as his or her accomplice." *Bishop*, 431 S.W.3d at 40. Independent corroboration of an informant's statement may buttress the credibility of the information, but "it is not necessary to corroborate every detail of the informant's information . . . or to directly link the suspect to the commission of the crime." *Id.* at 38 (internal citations and quotation marks omitted).

In this case, the police knew from eyewitness accounts that appellant had been involved in an altercation with the victims earlier in the day. The witnesses identified the vehicle driven by appellant to and from that altercation as a green Chevrolet Lumina. Witnesses also identified David Richardson as being involved in the fist fight. Sergeant Merritt testified that "[w]itnesses described seeing a vehicle that fit [the description of appellant's Lumina] at the top of the hill where the gunfire started." The Lumina was found outside the residence of a relative of David Richardson, and the police learned that the vehicle was owned by appellant's mother. When David Richardson was arrested, he inculpated himself and appellant in the shooting. Further connecting David Richardson and appellant, the police found the telephone number of appellant's mother saved in David Richardson's telephone. David Richardson obviously had a strong basis of knowledge of appellant's involvement as he was admittedly at the scene of the shooting. Regarding David Richardson's credibility, in our view, there was sufficient corroboration. Our supreme court has stated that "corroboration of 'only innocent aspects of the story' may suffice." *Bishop*, 431 S.W.3d at 38 (quoting *State v. Melson*, 342, 355 (Tenn. 1982)). Here, police knew that appellant had a motive to retaliate against the victims after being on the losing end of the altercation, and they knew that David Richardson was involved in the fight, also. Appellant was already a prime suspect based on the statements of the witnesses; David Richardson merely connected the dots for them. Thus, we conclude that all of the information available to the police at the time of appellant's arrest was sufficient to establish probable cause. Therefore, appellant's arrest was legal and does not provide a basis for suppression of his statement.

## 4. Forty-Eight-Hour Hold

Appellant argues, as a corollary to his probable cause argument, that the placement of a forty-eight-hour hold on appellant and his not being brought before a magistrate within forty-eight hours of his arrest signaled that the police did not have probable cause to arrest appellant, an issue with which we have already disagreed. He further argues that his statement should have been suppressed based on a *Gerstein* violation.

The law requires that when a person is arrested without a warrant, he or she must be brought "before a magistrate to 'seek a prompt judicial determination of probable cause.'" *Bishop*, 431 S.W.3d at 42 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975) (holding that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention")); *see also State v. Huddleston*, 924 S.W.2d 666, 672 n.2 (Tenn. 1996). Tennessee Rule of Criminal Procedure 5(a)(1) provides that "[a]ny person arrested — except upon a capias pursuant to an indictment or presentment — shall be taken without unnecessary delay before the nearest appropriate magistrate." The Tennessee Supreme Court has recently stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide

emergency or other extraordinary circumstance' caused the delay." *Bishop*, 431 S.W.3d at 42 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). Nonetheless, even a delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56).

The remedy for failing to bring an arrestee before a magistrate without unnecessary delay is exclusion of "any evidence obtained by virtue of a suspect's unlawful detention," unless an exception to the exclusionary rule applies. *Id.* (citing *Huddleston*, 924 S.W.2d at 673-75). However, "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id.* (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

In this case, contrary to appellant's assertions on appeal, he was brought before a magistrate within forty-eight hours of his arrest. He was arrested the evening of July 4 at approximately 7:40 p.m. and was formally charged the afternoon of July 6, at 3:23 p.m. Thus, for there to be a *Gerstein* violation, the delay had to have been for purposes of gathering evidence to justify the arrest, have been motived by ill will, or have been delay for delay's sake. None of those reasons applied in this case. Therefore, appellant is without relief as to this argument.[3]

## CONCLUSION

Based on our review of the record, the applicable law, and the parties' briefs, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE

---

[3] We note that this court recently reached the same conclusion when Devon Brown, appellant's co-defendant, raised similar arguments on appeal. *State v. Devon Brown*, No. W2013-00182-CCA-R3-CD, 2014 WL 4384954, at *10-16 (Tenn. Crim. App. Sept. 5, 2014).